OCT 2 2026 PM4:26
FILED - USDC - FLMD - TPA

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

Daniel A. Frishberg,
*Plaintiff*,
v.

Case Number: 8:26-cv-3017-WFJ-LSG

MDL TAMPA OWNER LLC, d/b/a PARK PLACE AT TAMPA;
PARK7 MANAGEMENT, LLC; JULIE KENNEY;
and SHANTEL RIDDLE,
*Defendants*.

# PLAINTIFF'S COMPLAINT

Daniel A. Frishberg, the Plaintiff ("Mr. Frishberg", the "Plaintiff") respectfully files this complaint (the "Complaint") against MDL Tampa Owner LLC, doing business as Park Place at Tampa ("Park Place"), Park7 Management, LLC ("Park7") (Park Place and Park7 together, the "Entity Defendants"), Julie Kenney, and Shantel Riddle (all together, the "Defendants"), seeking relief under the Fair Housing Act, 42 U.S.C. §§ 3601–3619 (the "FHA"), and alleges:

## PRELIMINARY STATEMENT

1. Plaintiff has a disability and a psychiatrist-prescribed emotional support animal, a cat. The terms "emotional support animal," "ESA," and "assistance animal" are used interchangeably in this Complaint and refer to the same



$405
TPA74974

animal; Plaintiff does not claim that the animal is a "service animal" as that term is defined in Fla. Stat. § 413.08. Defendants have had Plaintiff's medical documentation since 2024. They have never disputed his disability or his need for the animal. On April 13, 2026, they approved the accommodation in writing, "pursuant to applicable federal and Florida fair housing laws." (**Exhibit C**).

2. The same approval states that the community's rules will continue to apply to the animal "equally to all animals within the property," and that "[a]ll other terms and conditions of your Lease Agreement remain in full force and effect." Those rules bar every animal other than a "service animal" from the amenities, lounges, and pool area "at any time," and the doors to the courtyards and the amenity deck say "NO ANIMALS." Defendants approved the animal and, in the same document, kept in force the rules that exclude it.

3. Before that approval, Defendants tried to condition the animal on Plaintiff re-enrolling in a third-party website called PetScreening and on signing a disability-specific lease addendum, and their resident portal would not let him sign his renewal lease until he signed the addendum. Plaintiff objected in writing and cited the FHA. Four days later, Defendants revoked a lease renewal they had already offered and confirmed twice. One day after

Plaintiff escalated his fair-housing concerns to Defendants' corporate office, Defendants posted a "Three-Day Notice to Quit" on his door, telling him to be out of his home in four days, in the middle of his lease. The stated reason was two boxes of chips: one that a guest carried out of the lobby without Plaintiff knowing it had been taken, and one that Plaintiff himself returned, unopened, within hours.

4. Plaintiff filed a fair-housing complaint with the Hillsborough County Equal Opportunity Administrator's Office (the "EOA") and told Defendants about it in writing. Defendants' Vice President of Property Operations answered his continued assertion of his rights this way: "If you are not willing to assist us with understanding who was present, we will proceed with further investigating for additional violations." Within four days, Defendants issued two new violation notices against him.

5. Defendants then re-posted a disputed $48.89 charge to Plaintiff's account as "Charge – Repayment Agreement – #12103." There is no repayment agreement. Defendants configured their payment portal so that it would not accept Plaintiff's rent unless he paid the disputed charge with it, and in July 2026 they collected it that way. In September 2026, after Plaintiff spent an evening on the amenity deck openly accompanied by his approved animal, Defendants issued him the first smoking violation of his tenancy and a $200

charge, under a rule that is openly broken on that deck and, on information and belief, rarely enforced. They refused to say who made the observation, refused to hold the charge while Plaintiff disputed it in writing, and have not confirmed that they preserved the video they say they relied on. When Plaintiff asked in writing for the original recordings, Defendants' counsel answered with a seven-day notice threatening to terminate his tenancy. The notice lists Plaintiff's preservation demands among the conduct it recites.

6. Most of the evidence in this case is Defendants' own paperwork: their notices, their emails, their lease forms, and the written statements of their own managers. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, and costs.

## JURISDICTION AND VENUE

7. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 3613(a)(1)(A).

8. This action is timely. The conduct on which each claim is based occurred within two years of the filing of this Complaint or was part of a practice that continued into that period, and the policies challenged in Counts V and VI remained in force, and were restated to Plaintiff in writing, within that period. 42 U.S.C. § 3613(a)(1)(A) (two years after "the occurrence or the

termination of an alleged discriminatory housing practice"); *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 380–81 (1982) (a complaint that challenges "an unlawful practice that continues into the limitations period" is timely if filed within the period after "the last asserted occurrence of that practice"). The 2024 events described in Paragraphs 28 through 31 are pleaded as background to the timely claims and as the beginning of that practice; Plaintiff does not seek relief for them as separate violations.

9. No administrative process bars this action. On April 19, 2026, Plaintiff filed a fair-housing complaint with the EOA (Complaint No. 8.17.122.50; Investigation No. INV-26-04-026). The EOA administratively closed that complaint on July 30, 2026. Its closure letter states that the closure "does not affect any contractual, landlord-tenant, civil, state, federal, or other legal claims." On information and belief, the EOA is not an agency certified by the Department of Housing and Urban Development as substantially equivalent, and no complaint under 42 U.S.C. § 3610 was filed or referred. In any event, an aggrieved person may sue "whether or not a complaint has been filed under section 3610(a) . . . and without regard to the status of any such complaint," 42 U.S.C. § 3613(a)(2), no conciliation agreement was reached, and no administrative law judge has commenced a hearing on any charge, id. § 3613(a)(3).

10. Venue is correct and proper in this District under 28 U.S.C. § 1391(b)(2), because the property and every event described in this Complaint are in Hillsborough County, Florida, and in the Tampa Division under Local Rule 1.04, because Hillsborough County is in that Division.

## THE PARTIES

11. Plaintiff Daniel A. Frishberg is a natural person. He has been a tenant at Park Place at Tampa, 3400 East Fletcher Avenue, in unincorporated Hillsborough County, Florida 33613, since August 2024. He lived in Apartment 122-A through August 3, 2026, and has lived in Apartment 122-B since August 4, 2026, under a lease that runs through July 31, 2027. He is a person with a handicap within the meaning of 42 U.S.C. § 3602(h) (the FHA's term; this Complaint uses "disability" to mean the same thing) and an "aggrieved person" within the meaning of 42 U.S.C. § 3602(i).

12. Defendant MDL Tampa Owner LLC is a Delaware limited liability company registered to do business in Florida (Florida Document No. M21000005702), with its principal address at 461 Park Avenue South, Floor 4, New York, New York 10016. It is the owner of record of the Park Place at Tampa apartment community at 3400 East Fletcher Avenue (Hillsborough County Folio No. 034976-0000), a furnished student-housing property of

294 units. It does business as "Park Place at Tampa," the "Landlord" named in Plaintiff's leases.

13. Defendant Park7 Management, LLC is a Delaware limited liability company registered to do business in Florida (Florida Document No. M13000006046), with the same principal address, 461 Park Avenue South, Floor 4, New York, New York 10016. Park7's website describes Park7 as "the nation's premiere developer, owner, and operator of large-scale, purpose-built student housing properties," and its privacy policy identifies "Park7 Management LLC" as the entity operating under the Park7 name. Ms. Kenney signs her emails "Park Place at Tampa | Park7 Group," and Ms. Riddle writes from a park7group.com address. On information and belief, Park7 Management, LLC manages Park Place at Tampa for the owner, and its officers and employees directed and ratified the conduct described in this Complaint.

14. Defendant Julie Kenney is Park Place at Tampa's "National Property Manager." She is employed by one or both of the Entity Defendants. She personally wrote, signed, or issued the violation notices, the non-renewal, the Three-Day Notice to Quit, the April 13, 2026 accommodation approval, and much of the correspondence quoted below, within the scope of her employment and as Defendants' agent.

15. Defendant Shantel Riddle is Park7's Vice President of Property Operations. She personally wrote the statements attributed to her below, within the scope of her employment, as Defendants' agent, and as a managerial agent of Park7.

16. At all relevant times, each Entity Defendant acted through its employees and agents, including Ms. Kenney and Ms. Riddle, acting within the scope of their employment or authority, and is liable for their conduct under ordinary agency principles. *Meyer v. Holley*, 537 U.S. 280, 282, 285–86 (2003). Ms. Kenney and Ms. Riddle are sued for their own acts. An agent who personally commits or contributes to a violation of the FHA is liable for it. *Dillon v. AFBIC Dev. Corp.*, 597 F.2d 556, 562 (5th Cir. 1979) (agent who knowingly assisted the principal's discriminatory refusal, including by misrepresenting the reasons for it, was personally liable); *Sabal Palm Condos. of Pine Island Ridge Ass'n v. Fischer*, 6 F. Supp. 3d 1272, 1293–94 (S.D. Fla. 2014) (individual agents, including property managers, are liable for FHA violations they personally committed or contributed to); see *Bonner v. City of Prichard*, 661 F.2d 1206, 1207, 1209 (11th Cir. 1981) (en banc) (decisions of the former Fifth Circuit handed down before the close of business on September 30, 1981 are binding in this Circuit).

# FACTUAL ALLEGATIONS

## A. Plaintiff's disability and his assistance animal

17. Plaintiff has been under the care of Samuel A. Neuhut, M.D., a Florida-licensed psychiatrist (license ME116041), since February 2023.

18. In a letter dated January 10, 2024, Dr. Neuhut documented that Plaintiff "meets criteria for DSM 5 diagnostic disorder," has had "significant functional impairment due to the disorders," and that the resulting functional disability "corresponds to the description annotated in the American with Disabilities Act, Air Carrier Access Act and Fair Housing Act." Dr. Neuhut prescribed an emotional support animal and wrote: "It is my professional opinion that Mr. Frishberg has medical difficulties to function publicly without the assistance of his ESA, and will therefore require the ESA's company in all public locations, that would not cause an inconvenience to other patrons." (**Exhibit A**). Plaintiff has more detailed medical documentation. He does not attach it, because Defendants have never disputed his disability or his need for the animal (Paragraphs 1 and 19). Should they do so, Plaintiff will move for leave under Local Rule 1.11 to file that documentation under seal, or will provide it to the Court for in camera review.

19. The letter identifies the animal, a grey Russian Blue cat. Defendants have had the letter since Plaintiff's tenancy began in 2024. They accepted it, approved the animal, and have never questioned the disability or the need it documents. Defendants' own October 14, 2025 email states: "The letter you provided successfully verifies your disability and the need for the assistance animal, and that accommodation is approved."

20. Plaintiff has been a tenant since August 2024. He has paid every monthly installment, and he has never been charged a late fee. Before April 10, 2026, he had never received a notice of lease violation concerning any of the matters described in this Complaint.

## B. Defendants' Animal Policies

21. Defendants' form lease packet, which Defendants call their "standard community documents," contains a "No Pet/Animal Agreement." It was in Plaintiff's 2025–2026 lease, and it is in the 2026–2027 lease he e-signed on April 29, 2026. It provides, in relevant part: "Landlord has chosen to use a third-party to manage its relationship with any Pet or Service/Assistance Animal on property. EACH Resident on this Lease shall enroll with a third-party provider (at https://parkplaceattampa.petscreening.com), or a

subsequent provider at the Landlord's election, to complete their No Pets or Animals profile, BEFORE the Start Date." (**Exhibit L**).

22. The same agreement imposes "a minimum charge of $3,500.00 (plus all applicable taxes) in furnished Apartments to replace carpets, sofas, bedding, and repair any damage if an unauthorized pet/animal is in the Premises at any time and for any length of time." It states that "Allergens shall be considered damage," that the charge "applies whether the pet/animal belongs to YOU or not," and that "[t]he above violation charge applies even if damage isn't present."

23. The same agreement continues: "Should you decide to get a Pet or Service/Assistance Animal at any time before or during your lease term, you will be required to update your third-party profile accordingly, and sign any necessary lease documentation provided by Landlord, prior to bringing the Pet or Service/Assistance Animal on property. In addition to pet fees set forth by Landlord (if applicable), third-party provider may require, and Resident agrees to pay, an annual or monthly fee for their service. Service animals and assistance animals will not be subject to any pet fees or deposits, nor breed or weight restrictions." By its terms, the lease makes an assistance animal conditional on the third-party profile, on whatever "lease documentation" Defendants choose to require, and on any fee the third party

charges for its "service." (**Exhibit L**; 2026–2027 lease p. 19; the identical passage appears in the 2025–2026 lease).

24. The 2026–2027 packet adds: "You acknowledge any animal/pet may be removed if roommate(s) provides proper allergen documentation to management." That clause purports to allow Defendants to remove an animal unilaterally, without reference to the reasonable-accommodation process that federal and Florida law require.

25. The lease's Rules and Regulations provide, at Rule 40(e): "No pets (other than service animals required to be allowed by law) are allowed in the amenities, lounges, or pool area at any time. Any violations will result in an automatic nonrefundable suspension of your amenities/lounge facility/privileges." Rule 35 provides that residents "shall abide by the rules posted at each amenity," which makes the posted signs part of the lease. An emotional support animal is not a "service animal" under Florida law. Fla. Stat. §§ 413.08(1)(d), 760.27(1)(a). As written, Rule 40(e) bars Plaintiff's approved animal from every amenity and lounge area at all times.

26. On the glass doors between the residential building and the outdoor courtyards, Defendants have posted decals that read "NO ANIMALS" and "NO SMOKING / VAPING." Neither contains an exception for service

animals or approved assistance animals. Plaintiff photographed those decals on April 20, 2026. (**Exhibit U**).

27. The doors leading from the seventh-floor lounge and fitness center to the outdoor amenity deck carry decals that read "NO ANIMALS," "NO SMOKING / VAPING," and "NO GLASS," together with a label reading "Outdoor Amenity Hours 10 AM – 11 PM." None contains an exception for service animals or approved assistance animals. Plaintiff photographed the decals on the lounge doors on August 2, 2026 at 9:26 p.m., and on the fitness-center doors at 11:20 and 11:21 p.m. that night. (**Exhibit U**).

## C. 2024 and 2025: Enrollment Demands and The First Approval

28. PetScreening has been part of Plaintiff's tenancy from the beginning. On July 24, 2024, when Plaintiff applied to live at Park Place, PetScreening emailed him, under Park Place's logo: "Congrats on applying for your new home! As part of this application process, we ask that you complete a PetScreening profile(s). This step is required for all new leases, pet/animal owners and non-pet owners. Approval is conditioned on timely completing the PetScreening process. A delay in completion could push back the move-in date or even result in losing the property." The email listed "Required by: Park Place at Tampa." Eighteen minutes later, the platform confirmed that

his "No Pet Profile has been created." Plaintiff completed the profile because the application required it. (**Exhibit S**).

29. On August 6, 2024, while trying to submit his assistance-animal request through the platform, Plaintiff wrote to Defendants' leasing office: "I am attempting to complete the ESA application via petscreener, but it does not allow me to skip the 'Release of Information' portion of the form. I do not consent to the release of my information, and I do not want it to occur. I am also not required to provide it (or honestly even use the form). Under state and Federal law simply requesting accommodation (the word 'reasonable accommodation' does not need to be used) either in person, or in writing, is sufficient." He asked whether Defendants could "manually skip that step" or "just approve my request via email." Defendants' Community Assistant answered in writing: "The only documentation that is required is the ESA letter as well as the rabies documentation to be submitted in the Pet Screening. Pet Screening will not approve the animal if you do not give them permission to call the medical provider to verify the ESA animal you have is your animal. This is just for security reasons for our property and residents. If you would like to reach out to the Pet Screening support team to try to get around this you can but unfortunately that is what they require to approve the animal."

30. On August 16, 2024, Plaintiff's move-in day, while his request was pending with the platform, Defendants sent residents a property-wide "Animal Policy Reminders" email. It stated: "Unless you have an approved animal (supplied and completed the appropriate documentation in your PetScreening profile and signed the lease addendum to add an animal to your lease), you cannot have an animal in your apartment at any time, even if they are visiting for a few minutes (unless it is someone else's service or assistance animal). If you are caught violating this part of the lease, the minimum fine is $3,500 for a furnished unit." Plaintiff replied the same evening that he had submitted the assistance-animal request and that he was "not 100% sure that some of these policies are legal, as the fair housing act (federal and state) is pretty clear that simply requesting an accommodation (in any form, and at any time) is sufficient." Defendants' policy did not change.

31. On August 26, 2024, Defendants texted Plaintiff: "we have been told there is a cat in your unit but no cat is approved. the fine is $3500. please remove the cat immediately to avoid a fine." When Plaintiff answered that the cat was an emotional support animal and an assistance animal under the FHA, Defendants replied: "You do not have a completed and approved petscreening profile for the ESA or a lease addendum signed to add the animal," and "the cat cannot be in the unit until all that is done." Later that

day Plaintiff wrote: "I hereby formally request a reasonable accommodation in the form of an emotional support animal. Attached is supporting documentation from my doctor." Defendants answered: "I am sorry but we cannot proceed without an approved petscreening profile, thanks!" On August 28, 2024, Defendants wrote: "The housing provider has the right to work with third-parties such as assistance animal review services to help properly review reasonable accommodation requests," and, later that day: "We were able to verify the letter with your provider, please sign the addendum to add the cat to your lease." Plaintiff did not sign the addendum.

32. On April 4, 2025, Defendants texted: "Please upload proof of current rabies vaccination for your cat today to your PetScreening profile and sign the addendums in your portal. The rabies cert. expired in December 2024 -Park Place". Plaintiff answered that he would provide the vaccination record and that he would not sign an animal addendum because "The FHA does not require me to sign it."

33. Beginning June 29, 2025, the platform emailed Plaintiff that his "Assistance Animal Profile is up for Renewal" on August 28, 2025, "[a]s part of your lease renewal p[rocess]"; on September 12, 2025, that his profile "has expired"; and on September 6, 16, and 26, October 6 and 16, and November 15, 2025, that his profile was "Overdue: Non-Compliant," each addressed to

"FRISHBERG, DANIEL" and stating that "Park Place at Tampa requires a completed PetScreening profil[e]." In the middle of that series, on October 14, 2025, Defendants themselves wrote that the accommodation "is approved" (Paragraph 19). (**Exhibit S**).

## D. April 6, 2026: The Renewal-term Enrollment Demand

34. On April 6, 2026, PetScreening emailed Plaintiff: "Your property manager Park Place at Tampa has requested that you renew the pet profile for Shadow. The profile has expired and must be renewed to remain compliant with your property's pet policies." Three minutes later, Defendants' staff texted Plaintiff: "Please update your PetScreening animal profile, the one you had expired." (**Exhibit D**).

35. Plaintiff answered by text that he would not, because the FHA does not require the use of "a specific form, or specific questionnaire." Defendants' staff replied: "Without updated information, you will not be able to keep the animal on the property for your next term because it is a new lease agreement. Under FHA landlords can require documentation for service animals."

36. Plaintiff replied that he had already provided documentation and would provide it again, "just not via petscreening," and asked staff to check with a

manager because "the FHA is crystal clear on this." Defendants' staff answered: "per our property manager, your pet screening account will need to be updated for you to be allowed to keep your animal on the property for next term." Staff added: "We would not be allowed to impose policies not allowed by FHA. We are allowed to request documentation of service animals. You just need to go in and renew the account."

37. Only after Plaintiff objected a third time, in writing, did Defendants back down: "Please email the doctors note and current rabies vaccination proof to jkenney@parkplaceattampa.com for review." Plaintiff emailed his physician's documentation and the animal's vaccination record the same day.

38. Ms. Riddle later confirmed in writing (April 22, 2026) that PetScreening enrollment "is not a condition of keeping your animal." When Plaintiff stated that no further addendum, questionnaire, or third-party profile is required under the FHA, she answered: "Correct. You are not required to do anything in addition." (**Exhibit K**).

**E. April 10–13, 2026: The Renewal is Offered and Confirmed; The Portal conditions It On a Disability-specific Addendum**

39. On April 10, 2026, Defendants generated Plaintiff's 2026–2027 renewal offer (Apartment 122-B, twelve monthly installments of $1,345.00, term

August 4, 2026 through July 31, 2027). Plaintiff accepted the same day. At 4:10 p.m., Defendants' staff texted: "we just sent you the lease to review and sign in your portal, thanks!"

40. That evening, Plaintiff began signing the renewal lease in Defendants' resident portal. The portal would not let him proceed unless he first signed a "Service/Assistance Animal Agreement" addendum. That addendum applied to Plaintiff for one reason: his disability-related accommodation.

41. At 8:13 p.m. that evening, Plaintiff objected in writing: "I saw-- thanks. I was signing it--and then it wouldn't let me proceed without signing the animal addendum. I am not required to sign anything to be able to have an assistance animal. Also, you cannot make signing it a condition of obtaining housing. How do I proceed without signing it?" Defendants' only response that night was an automated after-hours message. The text message is time-stamped 8:13 p.m. Plaintiff's April 15 and April 17, 2026 emails (**Exhibits H and K**) placed this exchange on April 11; the message itself, sent the same evening the lease link was delivered, shows that it was April 10, and Plaintiff's later references to April 11 were his error.

42. On April 11, 2026, the platform emailed Plaintiff a "Reminder to Complete your Profile for Park Place at Tampa." On Monday, April 13, 2026, at 10:27 a.m., Defendants' staff texted: "Good morning, please check your email for

info on your assistance animal and a link to review and sign teh [sic] 2026-27 lease." The same morning, Ms. Kenney issued the "NOTICE OF APPROVAL – ASSISTANCE ANIMAL ACCOMMODATION." It approved the animal "pursuant to applicable federal and Florida fair housing laws," and acknowledged: "Although you have declined to sign the Service/Assistance Animal Addendum . . . ." It also stated that the animal "must still comply with the community's general conduct, health, and safety rules, which apply equally to all animals within the property," and that "[a]ll other terms and conditions of your Lease Agreement remain in full force and effect." (**Exhibit C**).

43. Ms. Riddle later admitted in writing that the animal addendum had been a prerequisite in the renewal packet and was removed ***only*** because Plaintiff refused to sign it: "It was removed previously since you refused to sign," and "It was previously removed." (**Exhibit K**).

## F. April 14, 2026: The Renewal Is Revoked

44. Defendants knew about the two incidents they later cited before they offered and confirmed the renewal. On April 9, 2026, at about 8:17 p.m., Plaintiff met a guest near the lobby and walked with him to his apartment. The guest was carrying a box of Takis he had taken from the lobby. Plaintiff did not

know it had been taken. On April 10, 2026, at about 1:06 a.m., Plaintiff took a box of chips from the lobby. He returned it, unopened, at about 12:50 p.m. the same day, promptly after Defendants texted residents asking for it back. Plaintiff's April 15, 2026 draft addendum refers to "the incidents of April 8th and April 12th," and his April 17, 2026 email (**Exhibit K**) refers to "the April 8 Takis incident." Those dates were Plaintiff's error. Defendants' April 14, 2026 email ("approximately 8:18 PM on April 9, 2026") and their April 17, 2026 chronology ("April 9th around 8:17PM" and "around 1:06 AM on April 10th") give the correct dates.

45. Defendants' own April 17, 2026 chronology states that Defendants were "missing two packages" on April 10; that they texted all residents that day asking whoever took them to return them "before we turn the video over to the police"; and that "[t]he video reflected that one package was stolen on April 9th around 8:17PM and the other around 1:06 AM on April 10th." A violation notice concerning the chips was logged on April 10 at 1:10 p.m. (**Exhibit E**). The same chronology states that Defendants attributed the Takis to Plaintiff's guest on April 14, "following the completion of" an investigation.

46. On April 14, 2026, four days after Plaintiff's written fair-housing objection, Defendants revoked the renewal. The leasing office wrote: "due to this

incident and prior lease violation (theft of the other box of chips), please be advised that your lease will not be renewed for the 2026–2027 lease term." Ms. Kenney repeated it: "Due to this incident and prior lease violation (theft of the other box of chips), your lease will not be renewed for the 2026–2027 lease term." When Plaintiff asked what he could do, she answered: "No, sorry, we will not be offering a 2026-27 lease to you to sign." The same April 14 email demanded that the Takis be returned by noon the next day, failing which Defendants would "pursue further action, which may include contacting local law enforcement and filing a police report." Twenty-five minutes later, Ms. Kenney wrote that she had "already bought a new box." Defendants never told Plaintiff that any police report was filed. (**Exhibit F**).

47. Defendants offered the renewal on April 10 and reconfirmed it on April 13. By then they knew both boxes had been taken, and they had video of both. On Defendants' own account, the only new fact on April 14 was their conclusion, drawn from that same video, that Plaintiff's guest had taken the Takis. They announced it four days after Plaintiff's April 10 written objection, and one day after Ms. Kenney approved the accommodation while recording in writing that Plaintiff had "declined to sign the Service/Assistance Animal Addendum."

## G. April 15, 2026: Plaintiff's Cure Proposal is Refused; He Escalates to Park7

48. On April 15, 2026, Plaintiff and his guest met with Ms. Kenney in person. The guest took responsibility and agreed to replace the Takis. Plaintiff then proposed, in writing, a "zero-tolerance" lease addendum: full guest responsibility, immediate termination for any future theft incident, and a permanent ban of the guest from the property.

49. Ms. Kenney refused the proposal in person at the April 15 meeting, and again in writing that evening: "We are not able to add additional addendums to our lease and we will not be allowing you to lease with us for the 2026/27 lease term." She had already refused Plaintiff's first written offer of an addendum on April 14: "No, sorry, we will not be offering a 2026-27 lease to you to sign." Defendants never made a counter-proposal. (**Exhibit F**). At the end of the meeting, Plaintiff requested that Ms. Kenney provide him with a way to contact Park7 or her superiors.

50. That evening, Plaintiff escalated in writing to Park7's corporate office (info@park7group.com), with a copy addressed to Ms. Riddle. He wrote: "I believe there is a Fair Housing Act issue with the decision not to renew my lease," set out the April 6–14 sequence, and asked that the matter "be reviewed by your legal department." (**Exhibit H**).

## H. April 16, 2026: the Three-Day Notice to Quit

51. The next day, April 16, 2026, Ms. Kenney signed and served a "THREE (3) DAY NOTICE TO QUIT." It was posted on Plaintiff's door and sent to his portal. It stated that he was "required to quit and deliver possession of the premises," and that "[i]f you do not vacate by 4/20/26, legal proceedings will commence to recover possession." That was a demand that Plaintiff leave his home in four days, in the middle of a lease that ran through August 3, 2026, over the same chip incidents. (**Exhibit I**).

52. The notice described the April 9 incident this way: "You met a guest in the building lobby and escorted him to your apartment. That guest was subsequently responsible for the unauthorized removal of a package from the building lobby that did not belong to him." It called that conduct "theft," "a serious and repeated lease violation," and "a lease violation and/or an illegal act," and stated: "This is not the first notice issued regarding this matter." The only earlier notice concerned the chips, a different incident. By then, the item at issue was a box of Takis that Ms. Kenney had written, two days earlier, she had "already bought a new box" to replace, and that the guest had agreed in person to replace.

53. The notice did not comply with Florida law. Terminating a residential tenancy for a non-rent violation requires seven days' written notice, Fla. Stat.

§ 83.56(2), and, for conduct of this kind, notice and an opportunity to cure, id. § 83.56(2)(b). A three-day notice is reserved for nonpayment of rent. Id. § 83.56(3).

54. The three-day period was not invented for Plaintiff. The notice came from Defendants' form template (it carries the legend "Revised 2 February 2026"), and it tracks the lease's own default provisions, §§ 17(c) and 17(e), which purport to allow eviction on "3 days" written notice "(or 10 days if we are seeking to recover attorney's fees)."

## I. April 17, 2026: Plaintiff Invokes the FHA; Defendants Rescind The Same Day

55. On April 17, 2026, at 12:33 p.m., Plaintiff emailed Ms. Riddle, with a copy addressed to Park7 executive Beejan Savabi, a detailed fair-housing analysis of the previous ten days, and put Park7 on notice to preserve evidence. **(Exhibit K)**.

56. At 3:02 p.m. the same day, Ms. Kenney rescinded both the non-renewal and the Three-Day Notice: "we are willing to rescind the non-renewal and eviction notice at this time. This matter will be treated as a single incident, and you are being granted one additional opportunity to remain in compliance with the lease moving forward."

57. The rescission came with a warning: "Any further lease violations will result in immediate eviction action without additional warning."

58. The rescission email described the Takis incident as one in which "your guest (and yourself) was involved and responsible." Three days earlier, Defendants had described their own footage as showing Plaintiff's guest "carrying the box of Takis."

59. Within eight days, Defendants' response to the same April 9 incident moved from non-renewal (April 14), to a demand that Plaintiff leave his home in four days (April 16), to a rescission "at this time" coupled with a warning of "immediate eviction action without additional warning" (April 17). The incident itself never changed. What changed in between was Plaintiff's written fair-housing escalation to Park7 on April 15 and his fair-housing and preservation letter on April 17.

## J. April 19–22, 2026: The County Complaint and Ms. Riddle's Written Statements

60. On April 19, 2026, Plaintiff filed a fair-housing complaint with the EOA (Complaint No. 8.17.122.50). On April 21, 2026, he told Ms. Riddle about the filing in writing.

61. On April 22, 2026, Ms. Riddle responded inline, in writing. She admitted that the animal addendum had previously been a signing prerequisite ("It was removed previously since you refused to sign"); that PetScreening enrollment "is not a condition of keeping your animal"; "Correct. You are not required to do anything in addition"; and "Confirmed. We have handled confirmation in house." To Plaintiff's disclosure of the EOA filing, she replied: "Thank you for letting me know. The timing of all events were unprecedented." (**Exhibit K**).

**K. April 27–29, 2026: Defendants Refuse to Put Their Confirmations in The Lease; Plaintiff Signs Under a Written Reservation of Rights**

62. On April 27, 2026, Plaintiff told Defendants in writing that, despite their confirmations, the renewal packet still contained both the mandatory-PetScreening clause and the roommate-allergen removal clause. Because lease § 21(c) makes the lease the entire agreement, he asked that the discrepancies be corrected "in a signed writing that forms part of the agreement," and offered two alternative minimal forms. (**Exhibit E**).

63. On April 28, 2026, Ms. Kenney refused: "we will not be amending the renewal lease or executing a separate addendum. The lease and its included addenda are standard community documents and will remain as written."

She confirmed in writing that Plaintiff's "assistance animal has already been reviewed and approved by management, and this approval is handled outside of and independent from the general No Pet/Animal Agreement language referenced in the lease packet," and that "PetScreening enrollment is not being required for you, as confirmation and documentation have already been accepted in house."

64. On April 29, 2026, Plaintiff signed the 2026–2027 renewal. He first stated in writing: "I am signing the 2026-2027 renewal in reliance on written confirmations from Park Place," listed them, and stated: "My signature does not constitute a waiver of any rights, including but not limited to my rights under 42 U.S.C. § 3604(f)(3)(B) and Fla. Stat. § 760.23(9)." Ms. Kenney countersigned the same day.

65. Plaintiff kept his housing nineteen days after accepting the original offer, after a revocation, an eviction demand, and repeated refusals of his cure proposal, on lease paper that still contains every term described in Paragraphs 21 through 25.

## L. Staff Disclose Plaintiff's Housing Status to Other Residents

66. In April 2026, Plaintiff's non-renewal became known around the building. An acquaintance raised it with Plaintiff, having heard of it through a chain of residents ("a friend of a friend of a friend") that began with property staff.

67. When Plaintiff raised this with management, Ms. Kenney acknowledged it in writing: "Staff are not authorized to discuss any resident's lease status or notices with others. We will be addressing this matter internally to reinforce expectations and training. We do not condone the sharing of resident information, whether directly or indirectly."

68. Having his housing status circulated in his own community was humiliating and distressing to Plaintiff, and compounded the injury of the retaliatory non-renewal.

## M. May 7–11, 2026: the Deck Gathering and Ms. Riddle's May 11 Message

69. On the evening of May 7 into the early morning of May 8, 2026, Plaintiff was one of many residents and others at a gathering on the amenity deck. A courtesy officer asked the group on the pool deck to leave at about 11:30 p.m. Plaintiff left immediately.

70. On May 8, 2026, a courtesy officer on the property told Plaintiff, in front of witnesses, in substance: "they have you and your boy on camera propping

the door," "they're trying to get you out of here," and "they're probably going to get you for last night." Plaintiff wrote the statements down in a note on his phone that night, naming the witnesses. The note is time-stamped 11:34 p.m.

71. At 4:54 p.m. on May 8, Ms. Riddle texted Plaintiff: "Hello Daniel. Shantel Riddle here, VP of Operations at Park7 Group. I understand you (and others) may have been on the dec[k] after hours last evening, re-entering at 12:07 AM following the courtesy officer's request that you (and a group of other individuals) leave around 11:30 PM. It also seems you allowed a small group of people into the lounge, which led to a large group, and the trash was not properly disposed of. What other residents were present, and what time are you available on Monday to discuss next action steps?" (**Exhibit M**).

72. Plaintiff answered in writing at 12:19 a.m. on May 9. The small group he had let in was not the larger group that arrived later and made the mess; his group cleaned up after itself and after others. He asked: "Could you confirm whether other residents present that evening are being contacted regarding this matter? If this inquiry is being directed solely at me, I would appreciate confirmation of that fact." He also asked Defendants to preserve, "in full and without selective excerpting," all common-area video for the relevant window.

73. On May 11, 2026, Ms. Riddle replied in writing: "You are the only individual the team was able to recognize (also have fingerprint data for some others) so I'm asking – who were the other residents present?" And: "If you are not willing to assist us with understanding who was present, we will proceed with further investigating for additional violations."

74. Ms. Riddle sent that message nineteen days after acknowledging, in writing, that Plaintiff had a pending fair-housing complaint.

## N. May 12–15, 2026: Two Violation Notices Within Four Days

75. On May 12, 2026, Defendants issued a Notice of Lease Violation assessing "cleaning and trash removal charges of $48.89 . . . per identified resident" for the May 7–8 gathering. (**Exhibit N**).

76. Nothing in the 2025–2026 lease or its fee schedule provides for a pro-rata "per identified resident" division of common-area cleaning costs. The schedule prices trash violations at "$100.00 per bag" and property damage at "[a]ctual cost of repairs + 15% Administrative Fee." Lease § 9 limits Plaintiff's responsibility to damage "caused by you, the other residents in your Premises, your family, or your guests." That list does not include strangers whom Plaintiff neither invited nor knew.

77. Plaintiff disputed the charge in writing the same day, within the notice's three-business-day window. On May 13, 2026, Ms. Kenney disclosed for the first time how the figure was calculated: "$35/hour for cleaning labor (4 team members for 1 hour)" and "$100 per bag of trash removed (3 bags total)," that is, $440 divided among nine identified residents. She refused to reverse it: "the charges will remain on your account, will not be reversed, and are due by 5/22/26. If an individual accepts full responsibility for the gathering and required cleanup, we can transfer the full balance to that responsible party." (**Exhibit O**).

78. By Defendants' own account, they identified the participants in the May 7–8 gathering from "access logs, video footage, and on-site documentation," and charged each identified resident $48.89. (**Exhibit O**). People on the amenity deck that evening were smoking, in view of the community's cameras. Defendants issued no smoking violation to Plaintiff for that evening and, on information and belief, none to anyone else.

79. On May 15, 2026, Defendants issued a second Notice of Lease Violation. It alleged that Plaintiff was observed on the pool deck outside permitted hours "[o]n May 7, 2026, May 8, 2026 and May 9, 2026." The May 9 date does not appear in Ms. Riddle's May 8 text, in her May 11 email, or in the May 12

notice; it appears for the first time in the May 15 notice, and Defendants have never identified who made that observation or when. (**Exhibit N**).

80. Both notices came within four days of Ms. Riddle's May 11 statement, and within about three weeks of Plaintiff's disclosure of his EOA complaint. Before his first written fair-housing objection, Plaintiff had received no notice of lease violation concerning any of the matters described in this Complaint. In the five and a half weeks after that objection, he received three such notices, a revoked renewal, and a Three-Day Notice to Quit.

## O. May 14–26, 2026: Defendants Keep The Clips They Selected, Quote $540 to Preserve The Rest, and Counsel Does Not Answer

81. In the same thread, Ms. Riddle refused to provide Plaintiff the courtesy officer's written statement ("we will not be providing that to you, but it has become part of your resident file"), while Defendants relied on that statement, and on video "clips" they selected, as the basis for enforcement against Plaintiff. (**Exhibit M**).

82. On May 15, 2026, Ms. Riddle wrote: "I have received the quote for preserving the camera footage per your request. The cost is $540, but you said you have no interest in paying. We will not bear the cost of saving this much data, at this time." She had also acknowledged that Defendants had

"saved several clips" of their own choosing. Plaintiff responded that preserving evidence in one's own possession is not a paid service to the party requesting it, and asked Defendants to confirm "in writing, by reply to this email, whether Park Place will preserve the material described above. A simple yes or no" would suffice. **Defendants never answered.**

83. On May 26, 2026, Plaintiff sent a written preservation demand to Defendants' outside counsel, Frank J. Catalano. It restated the scope of his May 9 and May 13 preservation requests, stated that both remained in effect, and asked counsel to confirm preservation in writing and to identify any responsive material that was no longer available and when it became unavailable. That demand has never been answered.

## P. June–July 2026: The Portal Refuses Rent Without The Disputed Charge; "Repayment Agreement #12103"

84. For the June 2026 rent cycle, Defendants' Entrata resident portal (the payment channel Defendants direct residents to use) would not accept Plaintiff's $1,315.00 monthly installment unless he also paid the disputed $48.89. On June 1, 2026, the portal rejected his installment-only payment with this message: "You are required to pay the full balance due, which is $1,363.89. Please check the amount you have entered." (**Exhibit R**).

85. Plaintiff had told Defendants' outside counsel about this problem on May 27, 2026. He stated that he was ready, willing, and able to pay rent in full and on time, and asked Defendants either to accept rent without the disputed charge or to identify, "with reference to a specific lease provision or fee-schedule item, the contractual basis for the $48.89 apportionment." No lease provision was ever identified. Counsel told Plaintiff to pay by check instead. Plaintiff answered on May 29 that he was not in Florida, that he could not guarantee that a mailed check would be received by the lease's June 4 late-fee date, and that he could pay the full $1,315.00 the same day by Zelle, by ACH transfer, or by card over the phone; he asked for a Zelle handle or routing and account numbers, or for acceptance of a card payment by phone with the 3% card-processing fee waived. He repeated the request on June 1, 2026, and, for the July cycle, on June 29, 2026. Neither Defendants nor their counsel ever supplied any of that information.

86. On June 3, 2026, through counsel, Defendants offered a one-cycle "courtesy" hold on the disputed charge, for June only, on the condition that Plaintiff pay $1,315.00. Plaintiff accepted, with an express reservation of rights. On June 4, 2026, Defendants posted a $48.89 credit; the portal then accepted Plaintiff's payment, which posted the same day.

87. On June 5, 2026, Defendants re-posted the disputed $48.89 to Plaintiff's ledger as "Charge – Repayment Agreement – #12103." (**Exhibit R**).

88. There is no repayment agreement. Plaintiff never entered into one, and he disclaimed the label in writing.

89. Defendants' notices claim the right to collect disputed charges by automatic draft: "Failure to resolve a violation at least five (5) business days prior to the 1st of the month may result in violation fees being automatically drafted from your monthly installment payment method." Ms. Riddle wrote the same: "You must log in to your portal to make changes if you do not want that charge to be drafted." On July 4, 2026, facing the same portal configuration, Plaintiff paid his final 2025–2026 installment together with the disputed $48.89, in a single $1,363.89 payment, under protest, again disclaiming "Repayment Agreement #12103" and reserving all rights. Defendants collected the $48.89 that day.

## Q. The Approved Animal is Excluded From The Common Areas

90. Rule 40(e), Rule 35, the posted "NO ANIMALS" decals, and the No Pet/Animal Agreement's minimum-charge regime (Paragraphs 21 through 27) operate together as a standing policy that bars Plaintiff's approved

animal from all amenities, lounges, courtyards, and common areas at all times.

91. Defendants' April 13, 2026 approval granted the accommodation and, in the same document, stated that "[a]ll other terms and conditions of your Lease Agreement remain in full force and effect," and that the animal "must still comply with the community's general conduct, health, and safety rules, which apply equally to all animals within the property." Rule 40(e) is one of those terms. Defendants approved the animal and, at the same time, kept in force the rule barring it from "the amenities, lounges, or pool area at any time," with no individualized assessment and no exception for an approved assistance animal. Defendants' own Service/Assistance Animal Addendum template, by contrast, contemplates the animal being outside the unit ("When outside, any animals must be confined by leashes and under Tenant's supervision at all times").

92. Plaintiff does not challenge the restrictions that Florida's public-pool regulations impose inside the fenced pool enclosure itself. The exclusion at issue is from the courtyards, lounges, game room, fitness center, other indoor common areas, and the outdoor amenity areas outside any such enclosure.

## R. July–September 2026: PetScreening is Still "required"

93. Beginning July 5, 2026, and continuing through at least September 25, 2026, Defendants' PetScreening platform emailed Plaintiff, at the addresses Defendants have on file for him, on at least sixteen dates through September 16, 2026, and again on September 25, 2026, that a PetScreening profile was required. On July 14, 2026, it wrote that enrollment was "required for all new leases, even if you do not have a pet or animal." On July 22, 2026, it wrote that enrollment was "required for all residents, including those without pets." Each of those emails stated "Required by: Park Place at Tampa." Between July 31 and August 25, 2026, it sent at least eight more, under subject lines such as "Non-Compliant Profile at Park Place at Tampa," "Immediate Action Needed: Non-Compliant Profile at Park Place at Tampa," and "At Risk: Non-Compliant Profile at Park Place at Tampa," each stating that "Park Place at Tampa requires a completed PetScreening profile to be on record for all new leases, even if you do not have a pet or animal." (**Exhibit S**).

94. Defendants themselves restated the mandate to every resident in August 2026. On August 12, 2026, at 1:39 p.m., Defendants emailed residents, from leasing@parkplaceattampa.com, an "Animal Policy Reminders" notice. It stated: "Unless you have an approved animal (supplied and completed the appropriate documentation in your PetScreening profile and signed the lease

addendum to add an animal to your lease), you cannot have an animal in your apartment at any time, even if they are visiting for a few minutes (unless it is someone else's service or assistance animal). If you are caught violating this part of the lease, the minimum fine is $3,500 for a furnished unit." It added: "If you have an approved pet, they are allowed in your apartment only, you cannot bring the pet to other apartments (this does not apply to approved service or assistance animals)." It then quoted the No Pet/Animal Agreement, including its terms that the $3,500 minimum charge "applies whether the pet/animal belongs to YOU or not" and "applies even if damage isn't present from the illegal pet/animal." The first sentence quoted above is, word for word, the sentence Defendants sent residents on August 16, 2024 (Paragraph 30). On August 13, 2026, and again, in identical form, on August 18, 2026, Defendants emailed residents a "Notice: Community Policies & Essential Property Information" stating, under "Other Important Reminders": "Unauthorized Animals: Animals must be approved via PetScreening and added to your lease. Unauthorized animals carry a minimum fine of $3,500 for furnished units." Each of the three August emails carries the footer "Copyright © 2024."

95. On September 5, 2026 at 9:57 a.m., and again on September 15, 2026, the platform emailed one of Plaintiff's addresses, and on September 6 and

September 16, 2026 another, under the subject "At Risk: Non-Compliant Profile - Park Place at Tampa," addressed to "FRISHBERG, DANIEL," stating: "Park Place at Tampa requires a completed PetScreening profile to be on record for all leases, even if you do not have a pet or animal. Please complete your profile immediately to comply with your pet policy," and "Required by: Park Place at Tampa." The September 16 email came six days after the September 10 notice described below and one day after Plaintiff's written dispute of it. On September 25, 2026, the platform emailed the first of those addresses again, four days before Defendants' counsel confirmed in writing, once more, that PetScreening enrollment is not required of Plaintiff (Paragraph 124). (**Exhibit S**).

96. Those emails came more than two months after Defendants confirmed in writing (Paragraphs 38, 61, and 63) that PetScreening was not required of Plaintiff, and after Plaintiff had signed the 2026–2027 lease with the No Pet/Animal Agreement still in it (Paragraphs 21 through 23 and 64). The carve-out Defendants gave Plaintiff in writing was never entered in Defendants' systems. The mandatory-enrollment term of the No Pet/Animal Agreement remained in force, and remains in force, for every resident of the community. As of September 16, 2026, Defendants' platform was still telling Plaintiff, by name, that he was "Non-Compliant" and "At Risk," and it

emailed him again on September 25, 2026. On September 29, 2026, Defendants' counsel confirmed the carve-out again in writing (Paragraph 124).

**S. August 2026: The Move to 122-B; The Animal Exclusion is Restated To Every Resident**

97. On August 4, 2026, Plaintiff's 2026–2027 lease term began and he moved to Apartment 122-B.

98. In August 2026, Plaintiff filed a complaint with the Florida Department of Health concerning the sanitation and safety of the community's pools. The Department inspected on August 19, 2026, closed the pools and spa for the violations it found, and cleared them to reopen on August 20, 2026.

99. On August 21, 2026, Defendants emailed all residents to announce that the pools and hot tub had reopened. The email stated that "[t]he outdoor amenity deck and pools are open daily from 10:00 AM to 11:00 PM" and that "[a]ny unauthorized access outside of these hours will be addressed and enforced." Under the heading "The Golden Rule: NO GLASS EVER," it announced "a zero-tolerance policy for glass containers in or around the pool and hot tub areas." Under "Quick Reminders," it stated: "No Pets on Rooftop Deck or Courtyards: Pets are not permitted on the rooftop deck or in the courtyards.

Please use the designated dog park located at the back of the building for your furry friends." It contained no exception for approved assistance animals. It said nothing about smoking or vaping. (**Exhibit T**).

100. On August 24, 2026, at a resident event sponsored by Defendants, a dog was present, unleashed, inside the fenced pool enclosure. A member of Defendants' staff greeted the dog's owners and petted the dog. Defendants had previously featured the same dog as "Pet of the Month" on the community's Instagram account. On information and belief, the dog was a pet and not a service animal.

## T. September 5, 2026: Plaintiff Uses The Amenity Deck Openly With His Assistance Animal

101. On the evening of September 5, 2026, Plaintiff was on the outdoor amenity deck with his assistance animal, openly visible, from at least about 8:46 p.m. through at least 9:41 p.m. Plaintiff photographed the animal on the deck at about 8:46–8:48 p.m., at about 9:00 p.m., and at 9:41 p.m.

102. At about 8:40 p.m. that evening, a courtesy officer was on the deck and spoke to a group of people about glass containers. Neither the officer nor anyone else on Defendants' staff said anything to Plaintiff about the animal, and no notice concerning the animal was ever issued.

103. The amenity deck is monitored by a permitted video-surveillance system of at least seven cameras covering the deck, which Defendants review for enforcement purposes (Paragraphs 45, 78, 108, and 110).

104. Later that evening, Plaintiff saw other people on the amenity deck smoking and vaping. More than twenty people were on the deck at about 9:00 p.m. On information and belief, none of them received a smoking violation.

## U. September 10, 2026: The First Smoking Violation of Plaintiff's Tenancy

105. On September 10, 2026, Defendants issued Plaintiff a "NOTICE OF LEASE VIOLATION." The document's creation timestamp is 9:51 a.m. Eastern that day, and its author field reads "Community Assistant." It states: "On September 5, 2026, you were observed smoking on the rooftop near the pool. Smoking and vaping are prohibited in all community amenity areas, and this conduct constitutes a violation of your Lease Agreement and Community Rules and Regulations. A $200.00 lease violation charge has been assessed to your account and is due within ten (10) days of the date of this notice. Future violations may result in additional fines and further lease

enforcement action, up to and including termination of tenancy." The notice does not say who observed anything, when, or on what basis. (**Exhibit W**).

106. The notice also states that disputes "must be communicated to Management, via email, invoices@parkplaceattampa.com, within three (3) business days," and that "[f]ailure to resolve a violation at least five (5) business days prior to the 1st of the month may result in violation fees being automatically drafted from your monthly installment payment method."

107. This was the first smoking-related notice Plaintiff had received in more than two years as a tenant. Smoking and vaping on the amenity deck are open and constant. On information and belief, Defendants rarely issue smoking-violation notices for conduct on the deck.

108. Smoking and vaping on the amenity deck by residents and their guests is open, frequent, and in plain view of the deck cameras. On numerous dated occasions between August 6, 2026 and the filing of this Complaint, including on September 5, 2026, Plaintiff saw other residents smoking, vaping, or using drug-related products on the amenity deck and in and around the pool (including in the pool itself), and saw cigarette butts in the pool water and on the deck. Plaintiff is aware of no notice of lease violation or charge issued to any of those residents for that conduct. Plaintiff kept dated, contemporaneous records of what he saw. Plaintiff does not have

access to Defendants' enforcement records; whether and how often any other resident has been charged for smoking on the deck is known only to Defendants, and Plaintiff expects to obtain those records in discovery.

109. For the May 7–8, 2026 gathering on and around the seventh-floor amenity areas, Defendants identified and charged nine residents using "access logs, video footage, and on-site documentation" (Paragraphs 77 and 78). Defendants issued no smoking violation to Plaintiff for that evening and, on information and belief, none to any other resident.

110. On September 7, 2026 (Labor Day), Defendants' courtesy officer spoke to a resident on the amenity deck about a glass container and, on information and belief, refused that resident's request for a warning rather than a charge because Defendants' cameras had already recorded the violation. The resident was charged. Defendants' enforcement on the deck is camera-driven, and Defendants review the deck cameras for violations.

111. On September 15, 2026, at 2:35 p.m., within the notice's dispute window, Plaintiff disputed the notice in writing to invoices@parkplaceattampa.com, copying Defendants' outside counsel. He asked Defendants to say who made the observation, approximately when, and whether it rested on video. He asked Defendants to provide, and to preserve "(in addition to the already existing preservation holds which

remain in effect)," any video of the observation and any incident report or written record underlying it. And he asked Defendants to confirm that the charge would be held while the dispute was resolved and would not be drafted from his payment method or applied against his October rent. (**Exhibit X**).

112. Ms. Kenney replied that afternoon, about forty-eight minutes later, with outside counsel still on the copy line. The reply stated that "[t]he lease violation and associated charge were issued based on information obtained by management regarding the September 5, 2026 smoking violation"; that "Management is not obligated to disclose the source of the observation, which may include observations made by residents, staff members, courtesy officers, vendors, law enforcement, or other individuals"; and that "Management also reviewed available video footage related to the incident." The reply attached a video file. It stated that "[t]he violation charge remains valid and is not being held pending your dispute," and that "[i]f you are enrolled in AutoPay with variable charges enabled, any unpaid balance, including this violation charge, may be processed with your October rent payment." The reply did not identify the source of the observation, did not provide any incident report or written record, and did not address preservation.

113. The attached file was not an export from Defendants' camera system. It was a seventeen-second screen recording of a playback session in Defendants' video-management software, created on September 15, 2026 at about 3:07 p.m. Eastern, thirty-two minutes after Plaintiff's written request. Throughout the recording, the software's timeline, marked from 2:00 p.m. to 4:00 a.m., shows a single unbroken bar across its full width. On information and belief, that bar marks footage stored on Defendants' system for that entire period. Defendants' September 5, 2026 recordings were therefore still on Defendants' system, and accessible to Defendants, ten days after the event and on the day Plaintiff asked that they be preserved and produced.

114. Under the lease, a fine that goes unpaid for ten days after it is levied is a listed event of default (§ 17(j)). Defendants also reserve the right, "[a]t our option and without notice," to apply "any payment received . . . first to your obligations which do not constitute Rent and, then to Rent," "regardless of whether or not you made notations on payments" (§ 3). By refusing to hold the disputed charge, Defendants put Plaintiff to a choice between paying a charge he disputed and exposing his tenancy to a claimed default and to having his October rent applied against the charge.

## V. September 16–29, 2026: The Preservation and Production Requests, and the September 29 Notice

115. On September 16, 2026, at 12:32 a.m., Plaintiff wrote to Ms. Kenney, copying outside counsel. He asked Defendants to preserve the complete original recordings, with metadata, from every camera covering the pool and amenity deck for the evening of September 5, 2026, together with any other footage reviewed in connection with the September 10 notice and the system's records of when that footage was viewed and exported, and to confirm preservation by Friday, September 18, 2026, or to state in writing that they would not preserve it. (**Exhibit Y**).

116. Ms. Kenney replied on September 17, 2026 at 1:33 p.m. Outside counsel had been removed from the copy line. Her reply, in full: "We received your request to preserve additional footage, metadata, and system records. Please explain why you would like management to preserve additional footage from the area and time period referenced in your request." She had answered Plaintiff's September 15 dispute within the hour, with a video attached. She answered the preservation demand thirty-seven hours after it was sent, after removing counsel from the email thread.

117. Plaintiff replied that afternoon, at 2:47 p.m. He restored outside counsel to the copy line and attached his May 26, 2026 preservation demand. He stated that nothing in his September 16 request was "additional" to the scope of his May 2026 preservation notices, asked for the complete

original recordings of the footage Defendants said they "reviewed," and asked Defendants to confirm preservation in writing by 6:00 p.m. on Friday, September 18, 2026, or to state in writing that they would not preserve it. Defendants did not respond by that deadline.

118. On September 22, 2026, Plaintiff asked Ms. Kenney in writing, again copying outside counsel, for a copy of the original footage from 7:30 to 8:30 p.m. on September 5, 2026 from every camera covering the pool and amenity deck, together with any other footage management reviewed for the September 10 notice, "as exported from the camera system, in their original format with metadata, not a clip or screen recording," by Friday, September 25, 2026, or to say in writing that Defendants would not provide it. He stated that the request was in addition to his earlier preservation requests and did not narrow them. Defendants did not respond by that deadline. (**Exhibit Y**).

119. As of the filing of this Complaint, Defendants have neither confirmed preservation of the September 5, 2026 recordings nor stated that they will not preserve them.

120. On September 29, 2026, at 4:11 p.m., Defendants, through their outside counsel, Frank J. Catalano of Hinshaw & Culbertson LLP, emailed Plaintiff, under the subject "Notice, Park Place At Tampa, Unit 122-B," an eight-page "Notice to Cease and Desist and Notice to Cure Noncompliance."

It is styled as a seven-day notice to cure under Fla. Stat. § 83.56(2)(b), and its first paragraph states that it "is being served as a statutory predicate to possible termination of your tenancy and eviction proceedings under Part II of Chapter 83, Florida Statutes." (**Exhibit AF**).

121. The notice recites, as a "pattern of noncompliance," the April 2026 chip incidents, the April 28, 2026 cushion, the May 7–8, 2026 gathering and the $48.89 charge, and the September 10, 2026 smoking notice, each of which had already been the subject of a written warning, notice, or charge. It then adds a category the lease does not contain, under the heading "Communications Directed to Management and Staff": "Since April 16, 2026, you have sent a steady stream of lengthy written demands to several on-site and corporate Park Place personnel. These include repeated, overlapping, and progressively broader 'preservation' and 'litigation hold' demands." It continues: "Even so, you continued to send formal disputes, and preservation demands directly to management in September 2026." The notice's table of "Lease Provisions Violated" identifies no lease provision for that conduct. On May 23, 2026, Defendants' counsel had asked Plaintiff to "discontinue communicating with Park Place on these specific issues and/or any other potential legal actions you may contemplate, and communicate with me on these issues going forward," and on May 26, 2026, to "confer

with me on any 'fair housing matter' as well." Plaintiff did so: each of the September 2026 communications the notice describes was sent to Defendants' counsel as well as to management (Paragraphs 111, 115, 117, and 118). The September 10 notice itself had directed that any dispute "must be communicated to Management, via email, invoices@parkplaceattampa.com" (Paragraph 106), and Plaintiff's September 15 dispute went to that address (Paragraph 111). Defendants' counsel had himself written to Plaintiff on July 1, 2026, about matters under the lease, that "[t]hat remains your responsibility under the lease and you will need to communicate with them."

122. Demand 6 of the notice reads: "Limit correspondence to management on subjects already addressed in prior preservation notices dated May 13, May 16, and September 2026. Park Place has received and acknowledged your prior preservation demands and reserves all rights related to same. Repeated or expanded demands on the same subject are unnecessary." Elsewhere the notice states: "Park Place has received and noted your prior preservation notices. They do not need to be repeated or expanded. Park Place is aware of the applicable law." The notice does not state that any recording or record has been preserved, does not provide the original

recordings Plaintiff requested on September 22, and does not say whether they still exist.

123. The notice states that management issued the September 10 violation "based on information it obtained and on its review of available video footage of the incident," and that "[a] copy of that footage was sent to you." The only video Defendants have sent Plaintiff is the seventeen-second screen recording described in Paragraph 113.

124. In a section headed "Matters That Are Not a Basis for This Notice," the notice states: "To be clear, this notice is not based on any request you have made for reasonable accommodation, or on your exercise of any right protected by the federal Fair Housing Act or Florida fair housing law." In the same section, Defendants' counsel confirmed: "On April 13, 2026, Park Place approved your assistance animal ('Shadow') without pet rent, pet fees, or pet deposits. On April 28, 2026, Park Place confirmed that PetScreening enrollment is not required for you."

125. The notice states that if Plaintiff does not cure within seven days, "or if the same conduct or conduct of a similar nature occurs again after you have received this notice and cured the noncompliance, Park Place may terminate your tenancy in accordance with Fla. Stat. § 83.56 without giving you an additional opportunity to cure," and that "Park Place intends to

terminate your tenancy under applicable Florida law without further notice, except as the law requires." Among the remedies it says Park Place "will also pursue" is "limiting or revoking your common-area and recreational-facility privileges." The notice was sent seven days after Plaintiff's September 22 request for the original recordings, twelve days after his September 17 reply attaching the May 26 preservation demand, and thirteen days after his September 16 preservation demand. Every charge it lists had been paid. The only conduct after September 10, 2026 that the notice identifies is Plaintiff's written dispute of the September 10 notice, his preservation demands, and his request for the original recordings.

## W. September 20, 2026: Plaintiff Pays Under Protest

126. On September 20, 2026, the tenth day after the notice, with the hold refused and the default and payment-application provisions described in Paragraph 114 in force, Plaintiff paid the $200.00 charge by credit card, separately from rent. He told Defendants in a contemporaneous written notice that he was paying under protest, only so that the charge would not be treated as a default or applied against his rent; that he still disputed the charge; and that the payment was not an admission and did not waive any of his rights.

127. Plaintiff has therefore paid $206.00, the $200.00 charge plus a $6.00 card-processing fee, on a notice issued under a rule that is broken openly on the same deck and that, on information and belief, Defendants rarely enforce.

## X. Injury

128. As a direct and proximate result of Defendants' conduct, Plaintiff has suffered emotional distress, anxiety, humiliation (including from staff circulating his housing status and from being singled out for investigation and charges), loss of sleep, out-of-pocket losses (including the $48.89 collected on July 4, 2026, the $200.00 charge, and the associated card-processing fees), and the burden of months of having to contest all of this in writing.

129. Twice in three days (the April 14 revocation and the April 16 Three-Day Notice), Plaintiff faced the imminent loss of his housing, with the fear and distress that accompanies it, while a full-time student. On September 29, 2026, he faced a written threat to terminate his tenancy again, this time from Defendants' counsel, in a notice that lists his own preservation demands among the conduct it recites.

130. Before Defendants' written approval of April 13, 2026, Plaintiff mostly kept his assistance animal out of the community's common areas, because of Rule 40(e), the posted "NO ANIMALS" decals, the No Pet/Animal Agreement's minimum-charge provisions, and Defendants' repeated demands that he sign an animal addendum and maintain a PetScreening profile (Paragraphs 28 through 37 and 40). Since that approval he has used the common areas with the animal. He has done so under a standing written policy that purports to bar the animal from those areas, under an August 21, 2026 directive to all residents restating that policy, past "NO ANIMALS" decals on the doors he walks through to reach those areas, and under the threat of the "automatic nonrefundable suspension" of his amenity privileges that Rule 40(e) prescribes. Whenever he is in those areas with the animal, he knows that Defendants can enforce those rules against him at any time, and he is anxious about being penalized, all the more so because Ms. Riddle wrote that Defendants would "proceed with further investigating for additional violations" (Paragraph 73), and two notices followed within four days. The loss and chilling of the use and enjoyment of his home and its common areas with his prescribed assistance animal is a continuing injury.

131. Defendants' conduct was intentional and willful, and was undertaken with knowledge of, or reckless indifference to, Plaintiff's rights under federal law. Defendants' own writings show that they knew the governing law: their staff wrote on April 6, 2026 that "[w]e would not be allowed to impose policies not allowed by FHA"; their April 13, 2026 approval invoked "applicable federal and Florida fair housing laws"; and Plaintiff's April 15 and April 17, 2026 letters put Park7's corporate office on notice of his fair-housing objections before the Three-Day Notice was served and before Ms. Riddle's May 11 message. The conduct was carried out or ratified by managerial agents (a National Property Manager and a corporate Vice President of Property Operations, acting in their managerial capacities), which supports an award of punitive damages under 42 U.S.C. § 3613(c)(1).

# COUNT I

## Fair Housing Act, 42 U.S.C. § 3604(f)(2) and (f)(3)(B) — Discriminatory Conditions on the Assistance-Animal Accommodation

*(Against the Entity Defendants and Ms. Kenney)*

132. Plaintiff incorporates Paragraphs 1 through 131, and in particular Paragraphs 21 through 25, 28 through 43, 61 through 63, and 93 through 96.

133. To state a claim for refusal of a reasonable accommodation, a plaintiff alleges that he is disabled within the meaning of the FHA, that he requested a reasonable accommodation, that the accommodation was necessary to afford him an equal opportunity to use and enjoy his dwelling, and that the defendants refused it. *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1225–26 & n.9 (11th Cir. 2016) (adopting as pleading requirements the elements stated in *Bhogaita v. Altamonte Heights Condo. Ass'n*, 765 F.3d 1277, 1285 (11th Cir. 2014)). A refusal need not be express. A housing provider's "failure to make a timely determination after meaningful review amounts to constructive denial." *Bhogaita*, 765 F.3d at 1286. A provider that already has the information it needs is not entitled to "extraneous information," *id.* at 1287, and one that withholds a decision while demanding information it already has or does not need constructively denies the request, even if it lets the tenant keep the animal in the meantime. *Id.* at 1286–87; *Sabal Palm*, 6 F. Supp. 3d at 1279, 1281, 1290–93; see also *Bhogaita*, 765 F.3d at 1284 (affirming summary judgment where the district court held that demanding removal of the dog "if he did not provide [the Association] with information it was not entitled to receive" was a constructive denial); *Bone v. Village Club, Inc.*, 223 F. Supp. 3d 1203, 1215–17 (M.D. Fla. 2016) (association that had previously approved a resident's emotional-support animal, then

demanded her medical records and proof of the animal's training and declared its intent to sue, could be found to have constructively denied the accommodation; its unexplained change of position supported an inference of bad faith).

134. Plaintiff has a handicap within the meaning of 42 U.S.C. § 3602(h). Defendants knew it. An exception to Defendants' animal and platform-enrollment policies was necessary for Plaintiff to have an equal opportunity to use and enjoy his dwelling. The accommodation is reasonable, and Defendants approved it in October 2025 and again in April 2026.

135. Defendants nonetheless conditioned Plaintiff's continued keeping of his approved animal, and his housing for the following term, on (a) enrolling and renewing in the third-party PetScreening platform, which required a release of medical information, and (b) signing a Service/Assistance Animal Addendum. They did so by blocking his renewal lease in their portal until the addendum was signed, and by telling him in writing that without PetScreening re-enrollment he would "not be able to keep the animal on the property for your next term." (Paragraphs 34 through 37, 40, 41, and 43).

136. Imposing disability-specific conditions on an accommodation that has already been granted, and threatening loss of the animal or the housing if the tenant declines them, discriminates in the terms, conditions, or privileges of

rental and in the provision of services or facilities because of handicap, in violation of § 3604(f)(2), and is a refusal to make a reasonable accommodation in rules, policies, practices, or services, in violation of § 3604(f)(3)(B).

137. Defendants' own writings admit that the conditions were not required: "this is not a condition of keeping your animal"; "Correct. You are not required to do anything in addition"; "It was removed previously since you refused to sign." (Paragraphs 38, 43, and 61). Their platform nonetheless kept demanding Plaintiff's enrollment as "required for all residents" in July 2026, and as late as September 16, 2026 was still emailing Plaintiff, by name, that his profile was "Non-Compliant" and "At Risk," and emailed him again on September 25, 2026 (Paragraphs 93 through 96). Defendants' lease makes the third-party profile, additional "lease documentation," and the third party's fee conditions of any assistance animal (Paragraph 23), and Defendants imposed those conditions on Plaintiff in 2024, 2025, and 2026 (Paragraphs 28 through 37).

138. Plaintiff has been injured by that conduct as described in Paragraphs 128 through 131.

## **COUNT II**

**Fair Housing Act, 42 U.S.C. § 3604(f)(1) and (f)(2) — Discriminatory Revocation of the Lease Renewal**

*(Against the Entity Defendants and Ms. Kenney)*

139. Plaintiff incorporates Paragraphs 1 through 131, and in particular Paragraphs 39 through 49.

140. Section 3604(f)(1) makes it unlawful to "otherwise make unavailable or deny" a dwelling because of a handicap, and § 3604(f)(2) makes it unlawful to discriminate in the terms, conditions, or privileges of rental because of a handicap. A landlord that refuses to renew a lease and directs the tenant to vacate makes the dwelling unavailable, and the FHA "protects renters not only from eviction, but also from discriminatory actions that would lead to eviction but for an intervening cause." *Hunt*, 814 F.3d at 1223. That the tenant is later allowed to stay "does not alter the prior discriminatory conduct." *Id.* at 1223–24 (quoting *McDonald v. Verble*, 622 F.2d 1227, 1233 (6th Cir. 1980)).

141. Defendants made the 2026–2027 renewal available to Plaintiff only on a condition that applied to him solely because of his disability-related accommodation: signing the Service/Assistance Animal Addendum, which Defendants' portal enforced as a prerequisite to signing the lease. Four days

after Plaintiff refused that condition in writing, Defendants revoked the renewal. (Paragraphs 39 through 47). Offering a dwelling only on disability-specific conditions, and withdrawing it when those conditions are refused, violates § 3604(f)(1) and (f)(2).

142. The reasons Defendants gave (two chip incidents they knew about before they offered and re-confirmed the renewal) were not the real reasons for the revocation. The timing; Defendants' escalation from non-renewal to a four-day eviction demand, and then to a same-day rescission once Plaintiff invoked the FHA, over an incident that never changed; and Defendants' refusal of Plaintiff's zero-tolerance addendum, which would have given Defendants more protection than the lease they later signed with him, together support the inference that the stated reasons did not actually motivate the revocation.

143. Plaintiff has been injured by that conduct as described in Paragraphs 128 through 131.

## COUNT III

**Fair Housing Act, 42 U.S.C. § 3617 — Coercion, Intimidation, Threats, and Interference (the Revocation and the Eviction Threat)**

*(Against the Entity Defendants and Ms. Kenney)*

144. Plaintiff incorporates Paragraphs 1 through 131, and in particular Paragraphs 39 through 59.

145. Section 3617 makes it unlawful "to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, . . . any right granted or protected by" § 3604. A plaintiff states a claim under § 3617 by alleging that the defendant coerced, intimidated, threatened, or interfered with him in the exercise or enjoyment of, or on account of his having exercised or enjoyed, a right granted or protected by § 3604. 42 U.S.C. § 3617; see *Dixon v. Hallmark Cos.*, 627 F.3d 849, 858 (11th Cir. 2010). A plaintiff who plausibly alleges an underlying violation of § 3604 also states a claim under § 3617. *Watts v. Joggers Run Prop. Owners Ass'n*, 133 F.4th 1032, 1043–44 (11th Cir. 2025). Threats can constitute coercion and intimidation under § 3617. *Sofarelli v. Pinellas County*, 931 F.2d 718, 722 (11th Cir. 1991) (a note threatening "to break [Sofarelli] in half," together with hitting his truck and spitting at him, "would clearly constitute coercion and intimidation under § 3617"); see also 24 C.F.R. § 100.400(c)(2), (c)(6).

146. Plaintiff exercised rights protected by § 3604(f): he kept an approved assistance animal, he objected in writing on April 6 and April 10, 2026 to

disability-specific conditions on that accommodation, and on April 15, 2026 he escalated his fair-housing objection in writing to Park7's corporate office.

147. Defendants then revoked his renewal (April 14, four days after the objection); refused his cure proposals (April 15); and served a Three-Day Notice to Quit demanding that he leave his home in four days (April 16, one day after the corporate escalation).

148. That conduct coerced, intimidated, threatened, and interfered with Plaintiff on account of his exercise and enjoyment of rights protected by § 3604(f), in violation of § 3617. The April 17 rescission did not cure the violation. A claim for damages remains live even though the tenant was ultimately allowed to remain, *Hunt*, 814 F.3d at 1220–21; the later reversal "does not alter the prior discriminatory conduct," *id.* at 1223–24 (quoting *McDonald*, 622 F.2d at 1233); a tenant who received three-day notices, contrary to the landlord's practice, after confronting its agent about a discriminatory statement, and who was never evicted, made out a prima facie FHA claim on evidence of emotional distress and fear of a future eviction, see *Harris v. Itzhaki*, 183 F.3d 1043, 1049–50, 1052 (9th Cir. 1999); and the rescission itself carried a new threat: "immediate eviction action without additional warning."

149. Plaintiff has been injured by that conduct as described in Paragraphs 128 through 131.

## COUNT IV

**Fair Housing Act, 42 U.S.C. § 3617 — Retaliation After the Fair-Housing Complaint (Investigation Threat, Notices, Portal Conditioning, and Selective Enforcement)**

*(Against all Defendants)*

150. Plaintiff incorporates Paragraphs 1 through 131, and in particular Paragraphs 55 through 65, 69 through 89, and 101 through 127.

151. Retaliating against a person because that person filed a fair-housing complaint, or reported a discriminatory housing practice to a housing provider, is conduct prohibited by § 3617. 24 C.F.R. § 100.400(c)(5), (c)(6). A retaliation claim under the FHA is analyzed under the familiar three-part framework: protected activity, adverse action, and a causal connection between the two. *Philippeaux v. Apartment Inv. & Mgmt. Co.*, 598 F. App'x 640, 644 (11th Cir. 2015) (unpublished) (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 (9th Cir. 2001)); *Bone*, 223 F. Supp. 3d at 1218. Requesting a reasonable accommodation is protected activity, and the adverse-action element asks whether the defendant's conduct amounts to

coercion, intimidation, threats, or interference. *Bone*, 223 F. Supp. 3d at 1218–19.

152. Plaintiff engaged in protected activity: he filed EOA Complaint No. 8.17.122.50 (April 19, 2026); he told Defendants about it (April 21, 2026); he signed the renewal under an express written reservation of his rights under § 3604(f)(3)(B) (April 29, 2026); he continued to assert his fair-housing rights in writing, including in his May 26, 2026 preservation demand to Defendants' counsel, his September 15, 2026 dispute, and his September 16, 17, and 22, 2026 preservation and production requests; and he used the accommodation Defendants had approved, by using the community's common areas openly with his assistance animal, including on September 5, 2026.

153. Defendants then: threatened in writing to "proceed with further investigating for additional violations" unless Plaintiff named other residents (May 11); carried out that threat with the May 12 charge (which the lease does not authorize) and the May 15 notice (which recites a date that appears nowhere else in the record); refused to provide Plaintiff the officer statement and footage they were relying on, while conditioning preservation on a $540 payment; configured their payment portal so that Plaintiff could not pay his

rent without also paying the disputed charge; and placed a fictitious "Repayment Agreement #12103" on his ledger.

154. On September 10, 2026, five days after an evening on which Plaintiff had used the amenity deck openly with his approved animal, in view of Defendants' cameras and with Defendants' courtesy officer present, Defendants issued Plaintiff the first smoking violation of his tenancy and a $200 charge, under a rule that residents break openly and often on that same deck and that, on information and belief, Defendants rarely enforce. They refused to say who made the observation. They refused to hold the charge while he disputed it, and pointed to the lease's default and payment-application provisions. They sent a seventeen-second screen recording instead of the recordings they said they had reviewed. When asked to preserve those recordings, they asked Plaintiff to "explain why."

155. On September 29, 2026, seven days after Plaintiff asked for the original recordings, Defendants, through counsel, served a seven-day notice threatening to terminate his tenancy "without further notice." The notice lists Plaintiff's "'preservation' and 'litigation hold' demands" among the conduct making up the "pattern of noncompliance" it recites, demands that he "[l]imit correspondence to management" on those subjects, and, in a section headed "Matters That Are Not a Basis for This Notice," disclaims any

connection to his fair-housing rights. (Paragraphs 120 through 125). A written threat to terminate Plaintiff's housing, made in response to his efforts to preserve and obtain the evidence for his fair-housing claims, is an adverse action taken on account of protected activity. See *Bone*, 223 F. Supp. 3d at 1219 (letter sent after a resident's assistance-animal request, presenting her with the choice of paying for mediation or being sued, could be found by a reasonable factfinder to be intimidation or a threat under § 3617) ; *Neudecker v. Boisclair Corp.*, 351 F.3d 361, 363–64 (8th Cir. 2003) (threats of eviction that were never carried out sufficiently alleged an adverse action under § 3617 at the pleading stage).

156. Defendants have never issued Plaintiff a notice about the animal being in the common areas. On information and belief, Defendants instead singled Plaintiff out for enforcement of a rule they do not otherwise enforce, because of his protected activity and his exercise of rights under § 3604(f). The facts supporting that inference include: no prior smoking violation to Plaintiff in two years and, on information and belief, only rare enforcement against anyone, despite open and frequent smoking on the deck in view of Defendants' cameras; Defendants' use of "video footage" and access logs to identify and charge nine residents for cleanup after the May 7–8, 2026 gathering, while issuing no smoking violations for that evening; Defendants'

camera-driven enforcement of other deck rules against other residents; Defendants' August 21, 2026 email to all residents, which announced a "zero-tolerance" glass policy and restated the animal exclusion but said nothing about smoking; the five-day gap between the alleged observation and the notice; Defendants' refusal to identify the observer or produce the underlying record; the September 29, 2026 notice, which answered Plaintiff's request for the recordings underlying the September 10 notice with a threat of eviction and named his preservation demands as part of the "pattern" it recites; and the pattern of adverse action that has followed each time Plaintiff has asserted his rights since April 2026.

157. Each of those acts, and the course of conduct as a whole, coerced, intimidated, threatened, or interfered with Plaintiff on account of his having exercised or enjoyed rights protected by § 3604(f), and on account of his having filed a fair-housing complaint and asserted his rights, in violation of § 3617.

158. Plaintiff has been injured by that conduct as described in Paragraphs 128 through 131.

## COUNT V

**Fair Housing Act, 42 U.S.C. § 3604(f)(2) and (f)(3)(B) — Discriminatory Terms, Services, and Facilities, and Failure to Accommodate, as to the Common Areas**

*(Against the Entity Defendants)*

159. Plaintiff incorporates Paragraphs 1 through 131, and in particular Paragraphs 21 through 27, 90 through 100, and 130.

160. Access to a community's common areas and amenities is among the "terms, conditions, or privileges" of rental and the "services or facilities" provided in connection with a dwelling. *Hunt*, 814 F.3d at 1224–25 (resident with a disability who was barred from the community room, the pool area, and the office, "facilities in the complex that were open to other residents," stated a § 3604(f)(2) claim); *Watts*, 133 F.4th at 1041 ("access to communal spaces is within the scope of the 'terms, conditions, and privileges' of the sale or rental of a dwelling"). The duty to make reasonable accommodations extends to "public and common use areas." 24 C.F.R. § 100.204(a); see id. § 100.204(b) (Example 1). An accommodation is, by definition, an exception to a rule of general application. A rule that applies to everyone may still have to yield: waiving it may be "necessary" to afford an equal opportunity "if the waiver addresses a need created by the handicap." *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1226 (11th Cir. 2008). An emotional support animal that has not been individually trained may be a reasonable

accommodation. *Warren v. Delvista Towers Condo. Ass'n*, 49 F. Supp. 3d 1082, 1087 (S.D. Fla. 2014); Fla. Stat. § 760.27(1)(a).

161. Rule 40(e), Rule 35, the posted "NO ANIMALS" decals, and the August 21, 2026 all-resident email, applied with no exception for assistance animals, by their terms exclude Plaintiff's approved animal from the amenities, lounges, courtyards, and other common areas of the property. The No Pet/Animal Agreement's third-party-profile, minimum-charge, and allergens-as-damage provisions, restated to every resident in the August 12, 13, and 18, 2026 emails, condition any animal's presence on the property on PetScreening enrollment and a signed addendum and attach a $3,500 minimum charge to any "unauthorized" animal.

162. Plaintiff's need for the animal in those areas arises from his disability. His treating psychiatrist documented that he "has medical difficulties to function publicly without the assistance of his ESA" and requires the animal's company "in all public locations" (Paragraph 18). The lounges, study areas, fitness center, game room, courtyards, and outdoor amenity deck are part of the dwelling Plaintiff rents and pays for. Defendants approved the animal on that documentation and have never contended that it poses any threat or has caused any damage.

163. Keeping that policy framework in place, and applying it to a resident with an approved, disability-related assistance animal, discriminates in the terms, conditions, or privileges of rental and in the provision of services or facilities because of handicap, in violation of § 3604(f)(2), and is a refusal to make a reasonable accommodation in rules, policies, practices, or services, in violation of § 3604(f)(3)(B).

164. Defendants' April 13, 2026 approval did not remove Plaintiff's animal from that framework. It kept it there. The approval states that the animal must follow the community's rules "which apply equally to all animals within the property," and that "[a]ll other terms and conditions of your Lease Agreement remain in full force and effect." A written approval that applies the community's rules to an approved assistance animal "equally to all animals," while expressly keeping Rule 40(e) in force, gave Plaintiff the label and withheld the accommodation itself. Defendants then restated the exclusion to every resident on August 21, 2026, again with no exception.

165. Defendants' health-and-safety rationale does not reach the courtyards, lounges, fitness center, game room, or other common areas outside the fenced pool enclosure. And Defendants apply no such rationale to animals they choose to allow (Paragraph 100).

166. Plaintiff has been injured by that conduct as described in Paragraphs 128 through 131.

## COUNT VI

### Fair Housing Act, 42 U.S.C. § 3604(c) — Discriminatory Statements and Notices

*(Against the Entity Defendants)*

167. Plaintiff incorporates Paragraphs 1 through 131, and in particular Paragraphs 21 through 27, 90 through 96, and 99.

168. Section 3604(c) makes it unlawful "[t]o make, print, or publish, or cause to be made, printed, or published any notice, statement, or advertisement, with respect to the sale or rental of a dwelling that indicates any preference, limitation, or discrimination based on . . . handicap . . . or an intention to make any such preference, limitation, or discrimination." The prohibition applies to "all written or oral notices or statements," 24 C.F.R. § 100.75(b), including a housing provider's rules, and it turns on how an ordinary reader would understand the statement, not on the speaker's intent. *Fair Hous. Ctr. of the Greater Palm Beaches, Inc. v. Sonoma Bay Cmty. Homeowners Ass'n*, 136 F. Supp. 3d 1364, 1374–75 (S.D. Fla. 2015), aff'd, 682 F. App'x 768 (11th Cir. 2017).

169. Rule 40(e); the posted "NO ANIMALS" decals on the courtyard doors and on the doors to the seventh-floor amenity deck (Paragraphs 26 and 27); the August 12, 13, 18, and 21, 2026 all-resident emails; the No Pet/Animal Agreement's third-party-profile, $3,500 minimum-charge, and allergens-as-damage provisions; and the 2026–2027 packet's roommate-allergen removal clause are notices and statements made with respect to the rental of a dwelling.

170. As written, posted, and sent, those notices and statements indicate to an ordinary reader a limitation and discrimination based on handicap, and an intention to make such a limitation or discrimination, in violation of § 3604(c): the decals and the August 21, 2026 email contain no exception for approved assistance animals; Rule 40(e) contains an exception that stops short of what the FHA requires; and the No Pet/Animal Agreement and the August 12, 13, and 18, 2026 emails tell every resident that an animal is "approved" only through PetScreening enrollment and a signed addendum, on pain of a $3,500 minimum charge.

171. Those statements have injured Plaintiff directly. The addendum requirement they announce was enforced against him through the portal lockout and the demands described in Paragraphs 34 through 43; the exclusion they announce has chilled and continues to chill his use of the

common areas with his assistance animal, as described in Paragraph 130; and they continue to be published to him and to every other resident.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that the Court:

**A.** Declare that Defendants' conduct violated 42 U.S.C. §§ 3604(c), 3604(f)(1)–(3), and 3617;

**B.** Permanently enjoin Defendants, their agents, and employees from: conditioning any assistance-animal accommodation on third-party platform enrollment or on signing addenda beyond what the law permits; enforcing Rule 40(e), Rule 35, the posted "NO ANIMALS" decals, the August 21, 2026 directive, and the No Pet/Animal Agreement's minimum-charge provisions against approved assistance animals in the common areas outside the fenced pool enclosure; conditioning acceptance of rent on payment of disputed non-rent charges; designating any disputed charge as a "repayment agreement" that Plaintiff did not enter into; and retaliating against Plaintiff, including by terminating or threatening to terminate his tenancy, or by limiting or revoking his common-area and recreational-facility privileges, on account of his protected activity;

**C.** Order corrective action, including: rescission of the May 12, 2026, May 15, 2026, and September 10, 2026 notices of lease violation and their removal from Plaintiff's resident file; a refund of the $200.00 charge and any associated fees; a refund of the $48.89 collected on July 4, 2026, and removal of any "Repayment Agreement #12103" designation from Plaintiff's account records; revision of Defendants' form lease documents, signs, and resident communications to include the exception for assistance animals that federal law requires; and fair-housing training for Defendants' staff;

**D.** Award Plaintiff compensatory damages, including for emotional distress, humiliation, lost use and enjoyment, and out-of-pocket losses, in an amount to be determined at trial;

**E.** Award punitive damages under 42 U.S.C. § 3613(c)(1);

**F.** Award costs, and reasonable attorney's fees under 42 U.S.C. § 3613(c)(2) should Plaintiff be represented by counsel;

**G.** Award pre- and post-judgment interest as allowed by law; and

**H.** Grant such other and further relief as the Court deems just and proper.

Dated: October 2, 2026 Tampa, Florida

Respectfully submitted,

Daniel A. Frishberg, pro se

3400 East Fletcher Avenue, Apt. 122-B

Tampa, Florida 33613

Telephone: 754-237-8472

Email: danielfrishbergdiscovery@gmail.com